<hr />

STATE OF MINNESOTA vs. GEORGE LAUTENSCHLAGER & others.

April 20, 1876.

**Requisites of Indictment for Murder.**—The case of State v. Dumphey, 4 Minn. 438, followed as to the requisities of an indictment for murder in the first degree.

**Ramsey County Common Pleas—Procedure.**—The trial of a criminal case in the court of common pleas of Ramsey county, as organized under Laws 1875, ch. 69, is not rendered invalid because both the judges of said court sit together and coöperate in the conduct of such trial. Neither will the temporary absence of one of the judges during a portion of the trial, no objection being made at the time, avail the defendant as ground of error.

**Challenge of Juror—Preliminary Questions.**—Interrogating a juror as to his qualifications, preliminary to his being challenged, is a matter purely discretionary with the trial court.

**Same.**—A challenge made and admitted excuses the juror, and such challenge cannot thereafter be withdrawn.

**Examination of Experts—Form of Question.**—The rule stated in Getchell v. Hill, 21 Minn. 464, in regard to the examination of an expert, approved and followed.

**Indictment for Murder—Description of Weapon—Proof.**—The indictment charged the homicide to have been perpetrated " by cutting the deceased with a hatchet, or with some other sharp instrument to the grand jury unknown." Defendant requested an instruction that the jury, in order to convict, " must be satisfied beyond a reasonable doubt that a cut was given to the deceased, either with a hatchet or with some sharp instrument, and that such cut was fatal." Held, that the request was properly refused.

**Same—Intent to Kill Presumed from Fact of Killing.**—An instruction that a premeditated design is to be presumed from the naked fact of killing, held,

in view of the facts appearing in the bill of exceptions, as stated in the opinion, not to be error for which a new trial should be granted.

**Same—Jury to fix Penalty on Conviction.**—Under Laws 1868, ch. 88, it is competent for the jury, whenever they find a person guilty of murder in the first degree, to determine by their verdict that he shall be punished by death.

The defendant was separately tried in the court of common pleas of Ramsey county, before *Brill* and *Simons,* JJ., upon the following indictment:

[Title.] "George Lautenschlager, Frank Rapp and Sophie Rapp are accused by the grand jury of the county of Ramsey, by this indictment, of the crime of murder committed as follows: The said George Lautenschlager, Frank Rapp and Sophie Rapp, on the first day of November, A. D. 1874, at the city of St. Paul, in this county, wrongfully, unlawfully and feloniously, and with force of arms, without authority of law, and with malice aforethought, killed one Ulrica Lick, by then and there cutting her, the said Ulrica Lick, with a hatchet, or with some other sharp instrument to the grand jury unknown, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the state of Minnesota."

During the empanelling of the jury, a proposed juror being called and presenting himself, the defendant's counsel, before challenging, asked to have him sworn to make true answers touching his qualifications and fitness to serve as a juror, in order to ascertain by such examination, or by such other examination as the court might direct, and before challenging, whether there was any cause for challenge of such juryman by the defendant. This the court refused to allow, and ruled that no questions could be put to the juror after he was called, touching his qualifications as a juror, until after a challenge had been interposed. The defendant excepted to the ruling and thereupon challenged the juror, and before any questions were asked the juror the state admitted the challenge, and the juror was ordered to, and did, stand aside, and was not sworn in the cause, to which order the defendant excepted.

Joseph Lick, Sr., a witness for the state, testified (among other things) that he was married to the deceased on May 15, 1874; that she was then a widow, with seven children, and that her name was Ulrica Haase; that, at the time of the homicide, the witness and the deceased, with said children, were occupying a lot on Tenth street, in St. Paul, on which was a building fronting on Tenth street known as the kitchen, and, about eighty feet in the rear of the kitchen, another building known as the new building, both of which were occupied by the witness and his family at the time of the homicide; that the defendant Rapp and his wife occupied the rear end of his (Lick's) premises, under a lease from deceased which gave Rapp a right of way over the premises on which the kitchen and new building were situated; and that the defendant Lautenschlager lived with his family upon a lot adjoining Lick's premises on the west.

The witness further testified that on the night of November 1, 1874, at about eleven o'clock, P. M., while he and the deceased were walking from the kitchen to the new building, the defendant sprang upon him and the deceased, and committed an assault upon the witness, who fell and became unconscious; that the deceased was struck by Lautenschlager with a stone-hammer or hatchet, and fell to the ground, and the witness never saw her afterwards; that the witness did not recover his consciousness until the third day afterwards, when he was informed of his wife's death; and that he saw no other person present at the assault except the deceased, Lautenschlager, and Frank and Sophie Rapp.

The witness also stated, on his direct examination, that a short time before the homicide the defendant Lautenschlager had abused the deceased, and said to the deceased and the witness that they (the deceased and the witness) had killed two of their children and set the house on fire, referring to a house that stood on the Lick premises in May, 1874, before the erection of the new building, and which was burned in that month, before the marriage.

On cross-examination the witness was asked the following question by defendant's counsel: " Did not the deceased give birth to twin children, of which you were the father, the day after your marriage to her?" In putting the question, the defendant's counsel stated that they proposed to follow up this evidence by showing that the witness was the father of these children, and that he resisted marrying the deceased until she would consent to convey to him, and did convey to him, the lot on which the kitchen, new building, and building occupied by Rapp were situated, which conveyance was made on May 9, 1874, a few days before the marriage, and the deed was recorded a few days after the marriage. The question was objected to as incompetent, irrelevant and immaterial, and not proper cross-examination. The objection was sustained, and defendant excepted.

The defendant's counsel, during the cross-examination, asked the following questions: 1. " Did the deceased give birth, the day after your marriage to her, to two living children; did they cease to live the next day, and, if so, do you know what caused their death? 2. Did you state to any one, at any time before the homicide, that your wife would be assaulted before the week was over, or words to that effect?" Both these questions were objected to and excluded on the same grounds as the former question, the defendant excepting.

During the cross-examination of this witness a view of the premises was had by the jury, pursuant to an order of the court, consented to by both parties, the defendant not being present at the view.

Afterwards the defendant's counsel asked the same witness the following question: " Before the fire, (referring to the burning of the house on the Lick premises in May, 1874,) were there not curtains, furniture and other articles taken from Mrs. Haase's (the deceased's) house to yours in the lumber-yard?" (referring to a lumber-yard where Lick had

testified that he had resided immediately before his marriage, and at the time of the fire.) This was objected to as immaterial and not cross-examination. The objection was sustained, and the defendant excepted.

Dr. Boardman, a witness for the prosecution, testified as to the wounds upon the deceased, and also as to the wounds upon Joseph Lick, Sr., and as to his being unconscious the night of the homicide, after the homicide, and on the following day. He also testified that he had heard the testimony of Joseph Lick, which was to the effect that he remembered nothing that had occurred on the day after the homicide relating to any inquest, and did not remember seeing the county attorney, or answering any questions, or giving his deposition on that occasion—the fact being that he gave his deposition on that day, which was afterwards introduced in evidence by the defence, and contained a detailed account of the assault, and was signed by him. The witness was asked: " From the testimony, might he have been, in your opinion, in such a condition on Monday, (November 2,) as to unconsciousness, as not to recollect anything that occurred on that day?" This was objected to by defendant as incompetent and immaterial, and that a hypothetical case should be put. The objection was overruled, defendant excepting, and the witness, in answer to the question, stated, among other things, that the condition enquired about in the question might have existed.

The defendant's counsel requested the court to instruct the jury as follows: " 1. The indictment herein is not an indictment for murder in the first degree. 2. The indictment herein is not an indictment under which the death penalty can be inflicted. 3. The indictment herein is not an indictment for murder in any of the degrees, or under which a verdict for murder in any of the degrees, can be rendered. 4. No verdict for murder or manslaughter herein can be found unless the jury are satisfied, beyond a reasonable doubt, that a cut was given to the deceased, either with

a hatchet or with some sharp instrument, and that such cut was fatal." Each of these requests was refused, and the defendant properly excepted. The charge of the court, so far as excepted to, is stated in the opinion. The jury found the defendant guilty of murder in the first degree, and also found·that he should suffer the death penalty.

During the trial, and while testimony was being given, *Brill*, J., was absent from the court on one occasion about twenty minutes, *Simons*, J., presiding alone, and adjourning the court during such absence. At the time the jury rendered their verdict, *Simons*, J., was not present, and *Brill*, J., alone presided.

The defendant moved for a new trial, and thereupon the court of common pleas certified the case to this court.

*H. J. Horn* and *I. V. D. Heard*, for defendant.

*Geo. P. Wilson*, Attorney General, for the State.

CORNELL, J.   1. The form of the indictment in this case is substantially that prescribed by the statute for murder, and that it is sufficient to support a conviction for murder in the first degree is *res adjudicata* in this state, and no longer open to discussion. *Bilansky* v. *The State*, 3 Minn. 427, 435 ; *State* v. *Dumphey*, 4 Minn. 438.

2. The fact that both the judges sat together during the principal part of the trial, and coöperated in conducting it, does not render the trial void, as claimed by appellant. Both possess equal and like jurisdiction, authority and power in all actions and proceedings in said court, save that in cases when they act jointly, and differ in opinion, that of the senior judge shall prevail. Both are authorized, except in motions for new trials, which must be heard jointly, separately to try court and jury cases during the same term and at the same time, to divide between them the business of the court, and otherwise to regulate the same, as they may jointly deem best. Laws 1875, ch. 69. The fact that both concurred in the doing of an act that each had the power to do did not render the act invalid. Either was competent to

hold the court and conduct the trial alone, and, there being no prohibition in the statute, the coöperation of the other did not deprive the court of its jurisdiction in the matter. The implied prohibition in the clause permitting them "by their joint consent to hear and determine any motions, and to try and decide any actions except jury cases," does not prevent their sitting together and conducting the trial in jury cases, but simply recognizes their inability to deprive a party of a jury trial in a case where that right is secured by the constitution.

The organization of the court is complete, and its jurisdiction the same, whether held by one or both of the judges; and when, during a trial which is being conducted in the presence of both, one of them is temporarily absent, this will not affect the validity of the proceeding, especially when, as was the fact in this case, no objection is made at the time.

3. It is purely discretionary with the court whether or not to allow either party to interrogate a juror as to his qualifications, without first interposing a challenge; and whenever a challenge is interposed by one party and admitted by the other, there is nothing to try, and the juror must stand aside. The action of the court below in this matter was strictly regular and correct.

4. The proposed enquiries of witness Lick, Sr., on his cross-examination, as to the alleged facts connected with his marriage to the deceased six months previous to the homicide, as to the birth and death of her two children the day after her marriage, the burning of her building, etc., were properly disallowed as not a pertinent cross-examination.

The offer to show the same facts on the defence was also properly overruled. It was not proposed to connect the witness with either the death of the children or the burning of the building, and hence proof of those facts was wholly irrelevant for any purpose. It is not pretended but that the marital relations between the deceased and the witness were of the most friendly character. Under such circumstances

ıt can hardly be claimed that the refusal of witness to consummate a marriage that took place six months previous to the homicide, except upon the condition of her deeding to him certain property, can be regarded as any evidence tending to show a motive on the part of witness to murder his wife. The ruling of the court in this matter was correct.

5. The enquiry of witness Lick on his cross-examination, whether he had at any time before the homicide stated to any one that his wife would be assaulted before a week, was properly overruled. It was so indefinite in every respect that its materiality and pertinency for any purpose cannot be discovered.

6. No error can be predicated upon the order of the court allowing a view of the premises by the jury, as no objection was made to it at the time. On the contrary, it appears that it was had at the request of the jury, and with the consent of both parties, and no request seems to have been asked by the defendant to be present at such examination.

7. It is objected as error that an enquiry was allowed to be put to Dr. Boardman, as an expert, based upon certain testimony which he had heard, instead of upon a hypothetical case. There seems to have been no question made as to what such testimony was, or what facts were proved by it. In effect, therefore, the enquiry was predicated upon the hypothesis that the facts stated by the testimony referred to, and which the witness heard, were true, and was a convenient mode of stating a hypothetical case, permissible in the discretion of the court, within the rule laid down in *Getchell* v. *Hill*, 21 Minn. 464.

8. In stating the means by which the killing was effected, the indictment charged it to have been done by " cutting her, the said Ulrica Lick, with a hatchet, or with some other sharp instrument to the grand jury unknown." The court very properly declined to charge the jury that, in order to convict, it was necessary for them " to be satisfied beyond a reasonable doubt that a cut was given to the deceased,

either with a hatchet or with some *sharp* instrument, and that such cut was fatal." This precise point was made in the case of *State* v. *Hoyt*, 13 Minn. 132, 142, and decided adversely to the defendant. The true rule, as there stated and recognized, is this: "It is sufficient if the proof agree with the allegation in its substance and generic character, without precise conformity in every particular." The same rule is also very fully considered and approved in *State* v. *Fox*, 1 Dutch. 566, 601.

The substantial charge in this case was the unlawful killing of the deceased by personal violence. Whether the instrument used in inflicting it was sharp or dull, whether the death resulted from a cut, stab, blow or some other like act of violence, were not matters so essentially descriptive of the offence as were necessary to be precisely stated in the indictment, or strictly proved as laid, (Gen. St. ch. 108, § 4,) and a variance in respect thereto must be deemed immaterial, as not in any way calculated to mislead the defendant as to the particular offence charged, or to prejudice him in his preparations for trial.

9. In its charge the court instructed the jury as follows: "As to the design, it was not necessary that this should have rankled in the heart of the defendant for weeks, or days, or even hours. If it existed in his mind at the moment when the act of killing was committed—if it was committed—that was sufficient." This portion of the charge was not objected to. The court further gave them the following instructions, to which, and every part thereof, defendant excepted: "The law presumes that every man intends to do that which he does. If the naked fact of killing is shown, the law presumes that it was done with a premeditated design; but if explanatory circumstances are shown, they are to be considered in arriving at the intent or design." The court gave them the definition of murder in its different degrees, as contained in the statutes, and charged that defendant was presumed by the law to be

innocent, and that, before they could convict him of the crime charged, they must be satisfied beyond a reasonable doubt that he killed Ulrica Lick, that he killed her without authority of law, and that he killed her with a premeditated design to effect her death, or the death of some human being, and that they were the exclusive judges of all the questions of fact in the case.

These instructions contained several distinct propositions, most of which are clearly correct and unobjectionable, and, conceding that some particular one or more of them are erroneous, it may well be doubted whether a general objection to the whole and every part thereof, without particularly specifying the obnoxious portion, would be sufficient upon which to predicate error.

The only point assigned as error in this court is the instruction that "the law presumes a premeditated design from the naked fact of killing." Though, as an abstract proposition, this instruction may be open to criticism, and not strictly accurate, yet the practical question presented for consideration is whether, taken in connection with the rest of the charge, and as applied to the facts in this case, it constituted such material error as may have been prejudicial to the defendant. The record before us discloses a homicide committed by the defendant without any provocation, by suddenly springing upon the deceased, while she was passing with her husband from one part of their premises to another, and striking her with a hatchet or stone-hammer, thereby felling her to the ground and causing her death. It contains no suggestion that the act of killing was perpetrated in any other manner, or under any other circumstances, and it cannot be presumed that the homicide was of another or different character than the one thus affirmatively shown by the bill of exceptions. Hence it must be assumed that the "naked fact of killing," referred to by the court, was a homicide committed in this particular manner, and its instruction must be understood as intending to

convey to the jury the idea that a premeditated design was to be presumed or inferred from the fact of an unlawful killing, perpetrated in such manner and under such circumstances, by the use of a hatchet or such like dangerous instrument, and where no other fact or circumstance appears to qualify the character of the act, or to indicate the motive with which it was done; and as it is presumed that every sane person intends the ordinary and natural consequences of his own deliberate act, and that every voluntary act springs from deliberate volition, and not blind passion; and as every act unlawful in itself is presumed to have been wrongfully intended till the contrary appears, (1 Taylor Ev. § 103 and note; 3 Greenl. Ev. §§ 13, 14; 1 Russell on Crimes, 482, and notes; *State* v. *Brown*, 12 Minn. 538, 543,) it follows that such a killing, unaccompanied by any circumstances of extenuation or explanation, necessarily raises the presumption that it was intentionally and maliciously done; and unless it appears that such intention was formed and executed under the influence of "a heat of passion produced by a sudden provocation, or in sudden combat," it is equivalent in import and meaning to a premeditated design, as that phrase is used in the statutes. *State* v. *Shippey*, 10 Minn. 223; *State* v. *Hoyt*, 13 Minn. 132, 149.

Upon this question of intention, as well as upon all other matters of fact, the court properly instructed the jury that the burden of proof was upon the prosecution; and, upon the record before us, we can discover no error in the charge in any way prejudicial to the defendant.

10. Save as restricted by §§ 5 and 11 of the bill of rights, there is no constitutional limitation upon the power of the legislature over the subject of criminal punishment. In most criminal offences it has, in the exercise of this undoubted power, prescribed a maximum and minimum penalty, and has imposed upon the court before which a conviction may be had the duty of graduating the punishment, within these limits, according to its own best discretion. No reason occurs

why the same rule or principle may not be applied to the crime of murder in the first degree, nor why, considered as a question of power, the discretion of fixing the greater or the less penalty in each particular case may not be left with the jury instead of the court. Our statute, which prescribes as a punishment for this offence the penalty of death or imprisonment for life, according as the jury may by their verdict determine, is a valid act of legislation.

Ordered that this case be remanded to the district court for Ramsey county, with instructions to proceed in awarding judgment and sentence upon the verdict.

GILFILLAN, C. J., *concurring.* I am not satisfied that the bill of exceptions shows the character and circumstances of the homicide so fully as to enable us to say that the charge to the jury that, "if the naked fact of killing is shown, the law presumes that it was done with a premeditated design," if erroneous, did not prejudice. The evidence in the bill from which such character and circumstances máy be gathered does not purport to be all there was on that part of the case, nor appear to have been inserted to illustrate this exception, and I do not think that, for the purpose of considering the exception, we can safely assume that the circumstances of the killing were precisely as that evidence indicates.

But I am of the opinion that, as an abstract proposition of law, the instruction was correct. The statute divides intentional killing, without authority of law, into two classes: *First.* "When perpetrated with a premeditated design to effect the death of the person killed, or any human being," it is murder in the first degree. *Second.* "The killing of a human being by another, in a heat of passion, upon sudden provocation, or in sudden combat, intentionally, but without premeditation," is manslaughter in the second degree. Except that a higher degree of conviction in the minds of the jury is required, criminal cases are tried upon the same principles of evidence as civil cases. The same

presumptions as to motives, from conduct and acts, obtain equally in both classes of cases. In both a person is presumed to intend the natural consequences of his own act. The intention to kill is presumed from the mere fact of killing, unless under such circumstances as prevent the presumption; and the intention which the law attributes to a person's acts is one formed by the ordinary and natural operation of the mind, from deliberation and reflection, and not one which is forced upon the mind by momentary and exceptional causes. Such momentary and exceptional causes must appear in order to modify or prevent this presumption, and the statute is framed in accordance with this rule of presumption. The exceptional causes of the intention to kill which will reduce the intentional, unlawful killing of a human being below the grade of murder in the first degree are, a heat of passion, sudden provocation and sudden combat. Where the intention arises from those circumstances, and there is no pause and deliberation of the mind upon it between its inception and its execution, the killing is manslaughter. All other cases of intentional, unlawful killing are murder.

It is true that one charged with crime is presumed to be innocent, and, in order to convict, the state must prove his guilt; and that one of the facts to be proved to establish the guilt of murder in the first degree is the premeditated ·design; but such design is to be proved by the same kind of evidence as though it were in issue in a civil action, and is proved by proof of facts from which the design is fairly and reasonably to be presumed.

Upon these reasons I concur in the judgment of the court.